# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-41463

United States Court of Appeals
Fifth Circuit
**FILED**
December 29, 2015
Lyle W. Cayce
Clerk

In the Matter of: DOMISTYLE, INCORPORATED

>   Debtor

_____

SOUTHWEST SECURITIES, FSB,

>   Appellant

v.

MILO H. SEGNER, JR., in his capacity as Trustee of the Domistyle, Incorporated Creditor's Trust,

>   Appellee

Appeal from the United States Bankruptcy Court
for the Eastern District of Texas

Before BENAVIDES, DENNIS, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

   Debtor Domistyle, Inc. owned a candle factory located on several acres in Laredo. At the inception of the bankruptcy, everyone believed the property was worth more than its three outstanding mortgages, which gave the largest security interest to Southwest Securities FSB. The trustee thus spent the better part of a year attempting to sell the property and realize the supposed

equity for the estate. When those efforts proved unsuccessful, dispelling any notion that there was equity in the property, the trustee abandoned the property to Southwest. That left one question for the bankruptcy case that we confront in this appeal: Should the estate or the secured creditor pay the property's maintenance expenses incurred while the trustee was trying to sell the property?

I.

Domistyle was a manufacturer and purveyor of home goods. It was placed in receivership in April 2013. Shortly thereafter, the receiver, Milo Segner, initiated Chapter 11 proceedings on the belief that Domistyle had sufficient equity to reorganize and emerge from bankruptcy as a going concern.[1] This belief turned out to be incorrect, and many secured and unsecured creditors—as well as professionals involved in the bankruptcy—will likely see no or severely diminished recovery.

One of the debtor's most valuable assets was an industrial building located on 17 acres of real property in Laredo ("Property"). The primary lien on the Property was held by Southwest in the amount of $3.69 million.[2] Recent appraisals had valued the Property at approximately $6 million. Segner thus believed that there was considerable equity in the Property that could be used to pay junior and unsecured creditors.

In early 2014, a plan of liquidation was confirmed. It established a "Liquidating Trust" with Segner as trustee. The plan gave the Trust until May 1, 2014 to sell the Property at a price sufficiently high to cover the value of the mortgage loan owed to Southwest Securities. It also obligated the Trust to

---

[1] The decision to file under Chapter 11 rather than Chapter 7 was motivated by Domistyle's representations as to the worth of its assets. Segner would have filed under Chapter 7 had he realized the true worth of the debtor's assets.

[2] Junior lienholders are Frost Bank and the Buell Group; the exact priority of their respective claims is not established in the record.

"maintain reasonable insurance" and "own the Real Property as a reasonably prudent owner would own it."

Segner's efforts to sell the Property began before the plan of liquidation was finalized and confirmed. Employing the services of a commercial real estate firm, he marketed the Property from approximately August 2013 until May 2014. Throughout this time, he paid the following expenses related to the Property: security, repairs to the roof and electrical system, mowing, landscaping, utilities, and insurance premiums.

Despite his efforts, Segner never received an offer sufficient to pay Southwest's secured claim and any superior tax claims in full. The only offer received, for $4 million, required Southwest's approval because the net proceeds from the sale would not provide for full payment of Southwest's lien. At that time, Segner asked Southwest to reimburse the Trust for some of the "surcharge"—the ongoing preservation and maintenance expenses being shouldered by the Trust. Southwest did not agree to the proposed terms, and the sale did not go through.

The May 1st deadline arrived but Southwest did not exercise either option available to it under the plan: foreclosure or a deed-in-lieu. Meanwhile, Segner continued to pursue a deal with the party who had offered $4 million. Segner lost the buyer on or around May 22nd. Soon after, he informed Southwest that he intended to cease paying certain expenses, including "insurance, security and utility service." Southwest objected because "such action would virtually destroy any value remaining in the Laredo Property." Segner then filed a "motion to abandon" the Property as "burdensome and of

inconsequential value to the Liquidating Trust."[3]  Southwest objected to the abandonment.

A few weeks later, with the motion to abandon still pending, Segner moved to surcharge the expenses paid in maintaining the Property from the start of the bankruptcy case.  The plan had explicitly reserved the Trust's right to seek surcharge to the extent allowable under Section 506(c) of the Bankruptcy Code, so long as the Trust had expended "actual funds" to "third parties" that "directly related to preserving or enhancing the Real Property;" stated examples included "security, *ad valorem* taxes against the Real Property, repairs to any improvement or fixture, replacements of any improvement or fixture, and electricity."[4]  Southwest objected to the requested surcharge.

In August 2014, the bankruptcy court held an evidentiary hearing on the abandonment and surcharge motions.  The parties reached a partial settlement during the hearing, agreeing that the Trust would abandon the Property as of September 13, 2014 and that Southwest would reimburse Segner for preservation and maintenance expenses as of June 1, 2014, which is just days after Segner had expressed an intent to abandon the Property.  Whether expenses incurred prior to that date should be subject to surcharge remained contested.  After hearing testimony and argument, the bankruptcy court granted a surcharge against the Property for those expenses in the form

---

[3] Segner acknowledges that he did not follow the abandonment procedure provided for in the Bankruptcy Code.  We use the term "abandonment" as it was used in the proceedings below: as a mechanism for Segner to disavow any continuing interest in or obligation toward the Property.

[4] The plan also listed examples of expenses that Segner could not seek to surcharge. These are "attorney's fees and expenses, the Trustee's time spent attempting to market the Real Property, and intangible expenses of the Estate."

of a priming lien.[5] Southwest timely appealed. At the request of both sides, we approved a direct appeal to the circuit under 28 U.S.C. § 158(d).

## II.

The general rule in bankruptcy is that administrative expenses cannot be satisfied out of collateral property "but must be borne out of the unencumbered assets of the estate." 4 COLLIER ON BANKRUPTCY ¶ 506.05 (16th ed. 2015). Section 506(c) provides a "narrow" and "extraordinary" exception to this general rule. *See In re P.C., Ltd.*, 929 F.2d 203, 205 (5th Cir. 1991). It states that:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c). To recover expenses under this provision, the trustee bears the burden of proving the following: "(1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the creditor benefitted from the expenses." *In re Delta Towers, Ltd.*, 924 F.2d 74, 76 (5th Cir. 1991). A bankruptcy court's finding of fact in the Section 506(c) analysis is reviewed for clear error. *See id.* Any legal conclusion is reviewed *de novo. See id.*

Southwest contends that Segner's request for surcharge fails on the last of these elements: that Southwest did not benefit from the expenses paid by

---

[5] At oral argument, Southwest presented a jurisdictional argument absent from its briefing: that pursuant to *In re Skuna River Lumber, LLC*, 564 F.3d 353 (5th Cir. 2009), the bankruptcy court lost jurisdiction over the Property once it approved abandonment and therefore lacked authority to order the surcharge. We acknowledged in *Skuna Lumber* that a bankruptcy court "ceases to have jurisdiction over [] property" that is "transferred out of a bankruptcy estate free and clear of all liens." 564 F.3d at 355. We disagree, however, that the sequence of events below present a jurisdictional problem under *Skuna Lumber*. The bankruptcy court here ordered the surcharge from the bench on August 13, 2014—*before* the effective date of abandonment, which was September 13, 2014. Although the surcharge was not memorialized and formally entered until September 24, 2014, this ministerial act simply confirmed the bankruptcy court's bench-made ruling on August 13, 2014.

Segner to preserve the Property. In rebuttal, Segner identifies at least two benefits enjoyed by Southwest: (1) receiving the Property with its value preserved and (2) avoiding preservation costs during the nearly 14 months that the Property was part of the Liquidating Trust. The bankruptcy court sided with Segner, concluding that "Southwest benefited, and the property, the collateral benefited from the expenses."

There are two components to Southwest's argument that Segner failed to meet the benefit requirement of Section 506(c). First, Southwest contends that the bankruptcy court incorrectly found that the expenses were incurred primarily for its benefit simply because it was the only creditor who received any payment from the Property. Second, even if the expenses were incurred primarily for its benefit, Southwest argues that there was insufficient evidence of the extent of any benefit it actually received.

A.

The first question is whether, as Southwest maintains, Section 506(c) is limited to expenses incurred by the trustee with a specific and exclusive intent to benefit the secured creditor. Such was not the case here, because Segner admitted to maintaining the Property with the intent of benefiting Southwest *and* the estate: he kept the Property in good shape to further his goal of selling it at a price above the amount of Southwest's lien, with the difference going to junior and unsecured creditors. Southwest refers to its proposed exclusive-intent-based rule as the "forward-looking" part of Section 506(c)'s benefit requirement.[6] It relies for support on our statement in *Delta Towers* "requiring that the claimant incur the expenses *primarily* for the benefit of the secured creditor." 924 F.2d at 77 (emphasis added); *see also P.C. Ltd.*, 929 F.2d at 205

---

[6] There is no question that Section 506(c)'s benefit requirement has a retrospective component: did the secured creditor actually benefit? Whether retrospective benefit was established below is the subject of Southwest's second argument.

("*Delta Towers* held that the benefit element requires 'that the claimant incurred the expenses primarily for the benefit of the secured creditor . . . .'" (quoting *Delta Towers*, 924 F.2d at 77)); *In re Senior-G & A Op. Co., Inc.*, 957 F.2d 1290, 1300 (5th Cir. 1992) ("In order to support a surcharge under Section 506(c), . . . the expenditures . . . must have been made primarily for the creditor's benefit." (citing *Delta Towers*, 924 F.2d at 77)).

Where does *Delta Tower*'s "primarily for the benefit of" language come from? Not the Bankruptcy Code. Section 506(c) speaks of "costs and expenses" that are "reasonable" and "necessary . . . [to] preserv[e], or dispos[e] of" collateral property. 11 U.S.C. § 506(c). It limits the amount of surcharge to "the extent of any benefit to the holder" of the claim secured by the collateral property. *Id.* Section 506(c) thus does not include an express requirement that the money be spent with any particular beneficiary in mind.

Consistent with the statute's text, the Collier's treatise focuses on the backward-looking aspect of the benefit inquiry: did the secured creditor in fact benefit from the expenses? *See, e.g.*, 4 COLLIER ON BANKRUPTCY ¶ 506.05 ("In general, a secured creditor receives a 'benefit' within the meaning of section 506(c) if the relevant expense preserved or increased the value of its collateral."); *id.* ¶ 506.05[6][c] ("[T]he facts of a particular case may justify charging the holder of a secured claim with certain expenses if a clear benefit to the secured creditor can be demonstrated."). The rationale for this "hindsight" approach is to prevent unjust enrichment: "a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost." *Id.* ¶ 506.05; *see also In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 483 (4th Cir. 1994) ("The purpose of this provision [11 U.S.C. § 506(c)] is to prevent a windfall to a secured creditor at the expense of the estate."). Similarly, our case law administering Section 506(c) has emphasized the unfairness of requiring "'the general estate and unsecured

creditors . . . to bear the cost of protecting what is not theirs,'" an inequity that can be avoided by surcharge. *See Senior-G & A*, 957 F.2d at 1298 (quoting *In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982)).

No such inequity results, however, when the estate bears the burden of general administrative costs which only incidentally benefit a secured creditor. Nonetheless, some trustees or administrative claimants have tried to invoke the statute—as they invoked the pre-existing legal rule on which the statute is based[7]—as a way to recover general administrative costs from fully encumbered assets. *See, e.g., In re Sonoma V*, 24 B.R. 600, 603–04 (B.A.P. 9th Cir. 1982) (application to surcharge legal fees arising from "general bankruptcy matters" and litigation between the debtor and another creditor); *Codesco*, 18 B.R. at 228 (application to surcharge legal fees incurred by debtor in failed reorganization). There was an arguable statutory basis for doing so. Consider what is probably the most standard and significant general administrative expense: legal fees for debtor's counsel. Amounts paid to debtor's counsel assisting with a reorganization or liquidation can be reasonable and necessary, and they often benefit a secured creditor. In *Codesco*, for example, these three requirements may well have been met in a case in which counsel sought to surcharge its fees—including fees related to negotiating the sale of a number of assets and for "day-to-day handling of vast array of problems, including litigation, insurance, financing, employee concerns, and related matters"— against collateral (accounts receivable and certain real property) securing the claim of a creditor. *See* 18 B.R. at 228. Yet the court denied the surcharge, concluding that the reorganization legal services were "primarily of benefit to

---

[7] Section 506(c) codified a "long, but somewhat inconsistent, line of cases . . . expressing and applying the equitable principle that a lienholder may be charged with the reasonable costs and expenses incurred by the estate that are necessary to preserve or dispose of the lienholder's collateral to the extent that the lienholder derives a benefit as a result." 4 COLLIER ON BANKRUPTCY ¶ 506.05[1].

the debtor" and any "tertiary benefit bestowed upon the secured property . . . is too indefinite and remote" to support surcharge. *Id.* at 229. Courts thus developed the judicial gloss of the "primarily for the benefit of the secured creditor" requirement to prevent Section 506(c) from swallowing the principle that general administrative costs must be borne by the estate. *See* 4 COLLIER ON BANKRUPTCY ¶ 506.05[6][c] (characterizing the trend in cases to "requir[e] that [an] expenditure . . . be designed primarily to bestow a benefit on the secured creditor" as a way of "stat[ing] [the] concept" that "care should be taken to distinguish expenses that truly contribute to the preservation or enhancement of the secured creditor's position" from "those that have no such effect").

Reflecting these origins of the "primarily for the benefit of" language, a number of circuit cases applying it over the years have stressed the lack of a direct connection between given expenses and the collateral at issue. These include the two circuit cases cited in *Delta Towers* as authority for the requirement: *In re Cascade Hydraulics and Utility Service, Inc.*, 815 F.2d 546 (9th Cir. 1987), and *Brookfield Production Credit Ass'n v. Borron*, 738 F.2d 951 (8th Cir. 1984). The expenses in *Cascade Hydraulics* included telephone expenses, federal withholding taxes, social security taxes, attorney fees, and executive compensation arising from operation of the debtor's business before it was liquidated. *See* 815 F.2d at 547. The Ninth Circuit reversed an order surcharging these expenses because there was no showing that these expenses "helped dispose of or preserve the value of the collateral." *Id.* at 549. Notably, costs associated with the sale of the collateral were also surcharged but were not disputed by the secured creditor. *See id.* at 548 n.1. *Brookfield Production* makes the same distinction. That case involved the debtors' costs in caring for and feeding turkeys and livestock, *see Brookfield Production,* 738 F.2d at 954 (Bright, J., dissenting), only some of which served as collateral for debt owed

to the secured creditor. *Id.* at 952 (majority opinion). The Eighth Circuit approved the lower court's decision to reject surcharge due in part to the debtor's failure to "ascribe actual expenses to specific items of collateral." *Id.*; *see also id.* at 954 (Bright, J., dissenting) ("Concededly, [debtors] have not provided the court with a specific accounting of expenditures that went to specific items of collateral . . . ."). A number of courts of appeals have made explicit the necessary connection between the expense and the collateral. *See, e.g., In re K & L Lakeland, Inc.*, 128 F.3d 203, 210 (4th Cir. 1997) (criticizing lower court for failing to identify how the expenses were "incurred primarily to protect or preserve [the secured creditor's] collateral"); *Cascade Hydraulics*, 815 F.2d at 548 ("To satisfy the benefit test of section 506(c), Cascade must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral."); *see also In re Towne, Inc.*, 536 Fed. App'x 265, 269 (3d Cir. 2013) (affirming bankruptcy court's finding that "'the primary benefit of [the attorney's] legal services was to the Debtors . . . rather than to preservation of the collateral of [the secured creditor]'").

Like these other circuits, we accept that an expense which was not incurred primarily to preserve or dispose of encumbered property cannot meet the requirement of being incurred primarily for the benefit of the secured creditor. But we also accept the inverse: that an expense incurred primarily to preserve or dispose of encumbered property meets the requirement. The necessary direct relationship between the expenses and the collateral is obvious here; all of the surcharged expenses related only to preserving the value of the Property and preparing it for sale. Indeed, only expenses "*directly related* to preserving or enhancing the Real Property" could be the subject of a surcharge motion pursuant to the plan of liquidation.

Our holding also finds support in one of our few decisions applying *Delta Towers*'s "primarily for the benefit of the creditor" language. *Senior-G & A*

held that a secured creditor had "misread[]" our case law in arguing that workover expenses, which were necessary to boost production from a well, could not have been incurred "primarily" for its benefit because it had only a 59.5% interest in the well's production. Emphasizing that the "primarily for the creditor's benefit" inquiry is "particularly case specific," we rejected the creditor's argument that *primarily* means *solely* with a common-sense explanation: the "very fact that PSI received 59.5% of the production rendered the workover expenses 'primarily' for its benefit." *Senior-G & A*, 957 F.2d at 1300. Likewise here. Even under the since-discredited view that the Property was worth $6 million, Southwest's lien represented almost two-thirds of the collateral's value. The possibility at the time the expenses were incurred that they could also benefit other creditors does not render surcharge unavailable.[8]

We are not persuaded to rule otherwise by two cases, both from outside our circuit, that Southwest reads as supporting a rule that expenses are never incurred for the "primary benefit" of the secured creditor when the trustee is trying to realize value for the estate: *In re Trim-X, Inc.*, 695 F.2d 296 (7th Cir. 1982), and *In re Estate Design & Forms*, 200 B.R. 138 (E.D. Mich. 1996). The expenses to be surcharged in *Trim-X* were storage, security, and utility charges associated with warehousing unspecified encumbered "assets." *See* 695 F.2d at 297. As relevant here, the trustee sought to surcharge expenses incurred between the start of the bankruptcy case and the date on which the trustee moved to abandon the property based on an appraisal that showed that the stored goods had no equity. *Id*. Although it acknowledged that the secured creditor benefited from the expenses "in the sense that it received the assets

---

[8] If the benefit to other creditors had been realized, there likely would be no surcharge issue. As Segner notes, the Bankruptcy Code gives a secured creditor priority of payment, which means that its interest is the last available source of recovery for collateral-related expenses.

unharmed," the Seventh Circuit agreed with the bankruptcy court's conclusion that "expenses incurred prior to the time the trustee determined [the debtor] had no equity in the assets were not for the benefit of [the secured creditor]." *Id.* at 301; *see also Estate Design & Forms*, 200 B.R. at 142 (reading *Trim-X* as "narrow[ing] the period of time in which a Trustee could surcharge a secured creditor" for expenses). The Seventh Circuit worried that "placing the responsibility for these expenses on a secured creditor would discourage a trustee from taking reasonable steps to assess an estate's position." *Trim-X*, 695 F.2d at 301.

We have never applied this holding from *Trim-X*, which *Delta Towers* cited as only one of many cases defining the general elements of Section 506(c) surcharge.[9] *See Delta Towers,* 924 F.2d at 76. We see a number of problems with a rule foreclosing the possibility of Section 506(c) surcharge for any expenses incurred prior to attempted abandonment. First, it is inconsistent with our earlier pronouncement that the "section 506(c) analysis is particularly case specific." *Senior-G & A*, 957 F.2d at 1300. Second, it can result in the unjust enrichment that the statute aims to prevent. *Id.* at 1298. Such would be the case here if Southwest were to avoid the surcharge, given that there is no indication it could have sold the Property earlier and avoided these expenses. Third, it would limit Section 506(c) to expenses incurred during the usually brief window of time when the trustee has attempted to abandon but has not been authorized to abandon. This is the likely effect of *Trim-X* because

---

[9] Southwest must look outside our case law for its proposed rule, as we have never relied upon *Delta Towers*'s "primarily for the benefit of the secured creditor" language to reject surcharge. *See Senior-G & A*, 957 at 1300 (finding the requirement met); *P.C., Ltd.*, 929 F.2d at 205–06 (remanding and instructing lower courts to take evidence on the necessity and reasonableness of the expenses and to reassess "the potential extent of benefit" to the secured creditor); *Delta Towers*, 924 F.2d at 77–78 (reversing district court and reinstating bankruptcy court's order denying surcharge because the bankruptcy court's factual finding that the secured creditor received no benefit was not clearly erroneous).

a trustee's fiduciary duty means that any cost incurred prior to abandonment must be undertaken with at least some hope that the estate will benefit. *See In re Pearson Indus., Inc.*, 178 B.R. 753, 761 (Bankr. C.D. Ill. 1995) ("A Chapter 7 trustee in bankruptcy represents the interest of the unsecured creditors and not the secured creditors. . . . [W]here property is fully encumbered, abandonment is the order of the day. A Chapter 7 Trustee should not act as a mere conduit for the benefit of secured creditors only."). Given these concerns, we see no basis for adopting a rule that is largely unmoored from the statutory text,[10] especially when the Supreme Court has twice had to emphasize the importance of fidelity to the text of this very statute. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 13-14 (2000); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (both interpreting Section 506).

This does not mean that the statute fails to account for the Seventh Circuit's concern that a trustee should have an incentive to act promptly in determining whether an asset has equity for the estate. Section 506(c) provides a mechanism for policing the expeditiousness of a trustee's actions. It

---

[10] The Seventh Circuit acknowledged that Section 506(c) codified a long-standing "exception" to the general rule that administrative expenses cannot be charged against secured creditors. It then downplayed the importance of the statute's text in order to reach its holding:

> Although the emphasis under the new statute is on "benefit" to the secured creditor, considerations of "consent" and "causation" [from pre-codification case law] are still relevant.
>
> The bankruptcy court's determination that the expenses incurred prior to the trustee's petition for abandonment were not for the benefit of [the secured creditor] is consistent with this rule. Although the secured creditor eventually "benefited" from these expenses in the sense that it received the assets unharmed, it did not in any way consent to or cause these expenses.

*Trim-X*, 695 F.2d at 301 (citations omitted).

limits the trustee's recovery to "necessary" preservation and disposal costs and expenses. *See* 11 U.S.C. § 506(c). To the extent that a trustee holds an asset longer than necessary to determine and realize its value, and the value turns out to be less than the creditor's secured interest, the creditor can challenge the necessity of the costs incurred by the trustee.[11]

B.

That leaves Southwest's argument that Segner failed to quantify the extent to which Southwest actually "benefitted from the expenses" in hindsight. *Delta Towers*, 924 F.2d at 76. It seems obvious that Southwest obtained some benefit from the expenses. Consider the security, lawn mowing, and roof repairs paid for by Segner, to name just a few of the expenses surcharged. Absent these, Southwest may have been left trying to sell a vacant building damaged by vandalism, filled with overgrown weeds, and saddled with a leaking roof. Southwest recognized as much when it objected to Segner's proposal to stop paying the expenses, explaining that "such action would virtually destroy any value remaining in the Laredo Property." But the statute requires the bankruptcy court to determine how much benefit the secured creditor actually received. *See* 11 U.S.C. § 506(c) (authorizing surcharge "to the extent of any benefit" to the secured creditor). As one court has framed the inquiry, in order to surcharge expenses, the trustee must "'show that absent the costs expended the property would yield less to the creditor than it does as a result of the expenditure.'" *Brookfield*, 738 F.2d at 952 (quoting approvingly

---

[11] For good reasons, Southwest does not challenge the necessity of the expenses in this case. First, no one disputed the appraisals that indicated about two million dollars of equity in the Property. Second, there is no indication that Southwest would have been able to sell the Property sooner if Segner had not attempted to obtain the equity cushion for the estate. In the approximately ten months that Segner marketed the Property, only one offer was received; it was presented to Southwest for approval, but the offer did not cover the entire amount of Southwest's lien.

from the district court opinion below); *see also In re Baum's Bologna, Inc.*, 50 B.R. 689, 691 (Bankr. E.D. Pa. 1985) (refusing to order surcharge when the debtor's attorney did not prove that the secured creditor "would have received less absent [the attorney's] efforts"). We have characterized this aspect of the benefit analysis as requiring that the secured creditor received a "direct and quantifiable" benefit. *See Senior-G & A*, 957 F.2d at 1300.

The bankruptcy court did not clearly err in finding that Southwest received a direct and quantifiable benefit from Segner's stewardship of the Property. Although Southwest claims that the court lacked any evidence of the *extent* to which Southwest benefited from the expenses, the testimony of Segner's experienced real estate broker was that the value preserved was at least as much as the amount expended.[12] Southwest cross examined the broker but did not offer a competing expert or a contradictory valuation. Based on the testimony of Segner's witness, the bankruptcy court found a benefit to Southwest that was, at minimum, equal to the amount of the expenses paid.

Southwest argues that the bankruptcy court "confused the mathematical exercise of adding up the expenditures with the 'direct quantifiable benefit' *to the secured creditor* meant by this Court in analyzing section 506(c)." The bankruptcy court's bench-made ruling is susceptible to that reading in isolation. Earlier in the hearing, however, the bankruptcy court specifically asked counsel "where in the evidence there's a quantification of the benefit to the creditor and how much, so we can add it up." From the transcript as a whole, it is clear that the bankruptcy court ultimately accepted the "benefit"

---

[12] Southwest claims that the broker's testimony was unreliable under *Daubert* and should be disregarded. This argument was not raised below or in Southwest's initial brief on appeal and is waived. *See Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015) ("Arguments raised for the first time in a reply brief are waived.").

proven up and argued by Segner: that each dollar of expense preserved at least one dollar of value.

The bankruptcy court's factual findings cannot be reversed absent clear error. *Delta Towers*, 924 F.2d at 76. Put another way, "a determination of whether expenses meet the requirements of [Section] 506(c) depends upon the facts of the particular case" and this court sitting in review "does not enjoy absolute freedom to make its own findings" after "re-weigh[ing] the evidence." *Id.* at 77–78.

## III.

As the bankruptcy court noted, the outcome of this proceeding was regrettable. Everyone believed that Southwest was oversecured and that the Property, properly preserved, would yield additional recovery to the estate as a whole. Everyone was wrong. But Southwest's articulated rule that would preclude surcharge of pre-abandonment expenses stretches Section 506(c) beyond its text and contradicts its equitable purpose.

AFFIRMED.